**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| HEATHER HARDY,<br><br>*Plaintiff*,<br><br>*v*.<br><br>JAKE JOSEPH PAUL; MOST VALUABLE PROMOTIONS, LLC; HOLDEN BOXING LLC; and BRYCE HOLDEN.,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. |

**COMPLAINT**

Plaintiff Heather Hardy, by and through her attorneys, ChaudhryLaw PLLC, as and for her complaint (the "Complaint") against Jake Joseph Paul ("Jake Paul" or "Paul"), Most Valuable Promotions, LLC ("MVP"), Holden Boxing LLC ("Holden Boxing"), and Bryce Holden ("Holden"), (collectively, "Defendants"), respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1. This case is about what happens when a business chooses profits over safety. Heather Hardy is a respected professional boxer, a former world champion, and one of the recognizable figures who helped build modern women's boxing. For years, she gave the sport her body, her labor, and her reputation. Defendants Jake Paul, Most Valuable Promotions, LLC, Bryce Holden, and Holden Boxing LLC used that reputation—and Hardy's financial vulnerability—to place her into a dangerous and unnecessary rematch against MVP-represented Amanda Serrano ("Serrano"). Defendants knew, or should have known, that the bout presented an extraordinary and foreseeable risk of serious neurological harm to Hardy. They moved forward anyway.

2. The core facts are straightforward. Hardy fought Serrano in 2019 and lost decisively. No unresolved controversy, no close decision, and no legitimate competitive reason demanded a rematch. Given their fighting styles and strengths, Hardy's longtime promoter, DiBella Entertainment, Inc. ("DBE"), through its President and Chief-Executive Officer Lou DiBella (hereinafter, "DiBella" as to both DBE and Lou DiBella), understood the danger of a rematch to Hardy and refused to help arrange the rematch out of concern for Hardy's safety. That should have ended the matter, but it didn't.

3. To be clear, it was not just DiBella who believed the Serrano-Hardy rematch would be unsafe for Hardy. Larry Goldberg, the promoter for Hardy's two fights preceding the Serrano rematch, felt the same way. So, too, did Bruce Silverglade, the founder of famed boxing gym Gleason's (and Hardy's longtime friend). In other words, it was not a close call.

4. In securing the Serrano-Hardy rematch (and exploiting a vulnerable Hardy in the process), Defendants went around DiBella (Hardy's long-term promoter and representative), used Holden Boxing as a nominal intermediary, and structured the transaction so that MVP and Paul could secure the fight while obscuring the true alignment of interests behind the fight. By doing so, the people who stood to profit from the event controlled the essential terms, promotion, and matchmaking while Hardy lost the protection of boxing regulations, standard industry practices, and the Muhammad Ali Boxing Reform Act ("Ali Act"), 15 U.S.C. §§ 6301–6313. They won bigtime, and Hardy now has permanent brain injury.

5. Those circumvented safeguards matter because boxing is not ordinary entertainment. It is a regulated combat sport in which the commercial success of an event depends on athletes absorbing physical punishment. The law and industry practice recognize that promoters and fighters do not always have the same interests; a dangerous conflict

insidiously lurks. A promoter benefits when a bout sells tickets, attracts viewers, generates publicity, and advances the careers of favored fighters. A fighter, by contrast, must weigh compensation and opportunity against the risk of permanent injury. That is why independent representation, honest disclosures, balanced matchmaking, medical safeguards, boxing glove and gear testing and research, and commission oversight are the system's basic protections against exploitation of fighters.

6. Jake Paul and MVP dismantled those protections here. Defendants did not bring Hardy into the Serrano rematch through a transparent, arm's-length process in which Hardy's independent advocate could evaluate the risks and negotiate in her best interests. Rather, Defendants bypassed that advocate, concealed material conflicts[1], and used their own intermediary to procure Hardy's participation. Congress enacted the Ali Act to prevent precisely this conflict of interest, where a fighter must make a decision affecting her career and health while those orchestrating the transaction are motivated by their own commercial objectives. Here, Defendants' venal motivations directly endangered Heather Hardy's safety and well-being.

7. The danger was obvious. Hardy had already suffered a decisive defeat to Serrano years earlier. Hardy's own representative had significant, justified safety concerns. But the rematch offered Defendants a commercially useful narrative while advancing their agenda: a popular and recognizable former champion (Hardy) elevated MVP's star fighter (Serrano) on a major platform, while MVP could package the bout as part of their public commitment to women's boxing. But the matchup was not fighter-first, it was profit-first. Hardy's value to Defendants was not that she was likely to defeat Serrano, or even that the fight would be

[1] Ms. Hardy did not learn of these conflicts (*see* Section IV and VI below) until March 20, 2026, when her attorneys investigated her claims and learned of them from professional boxing sources with personal knowledge of these conflicts.

competitive; it was that her name, history, and credibility could help sell a fight whose likely result served MVP's promotional interests and all but guaranteed Serrano's physical safety.

8. For Defendants, this was not an isolated event. Hardy's career-ending fight was just one night in Defendant's broader pattern of repeatedly prioritizing spectacle, publicity, and revenue over ordinary safeguards of competitive fairness and fighter safety. MVP and Paul infamously pursued or promoted bouts involving stark disparities in age, size, experience, or competitive ability, and sought regulatory paths (or loopholes) that allowed commercially valuable fights to proceed despite obvious safety concerns. That relevant pattern shows MVP and Jake Paul's true business model: identify a marketable fight, manage or evade the safeguards that might prevent it, rake in the cash, and let the fighter absorb the physical consequences.

9. Meanwhile, publicly, MVP promoted itself as a disruptive, fighter-friendly force, especially in women's boxing. But privately, Defendants' conduct told a different story. They used women fighters to build their brand, create narratives, and generate attention. But when safety concerns conflicted with commercial value, safety lost. The promise of elevating women's boxing became, in practice, a vehicle for extracting value from women fighters while shifting the long-term physical cost onto them. Defendants put that approach on display in 2023 when Heather Hardy entered Jake Paul's orbit. Rather than protecting a veteran athlete with a questionable medical background from years in the ring, Defendants used Hardy as a means to an end, subjecting her to repeated head trauma from a fighter everyone knew would punish Hardy in the ring. Paul and MVP prioritized spectacle and revenue over the risks to Hardy's long-term health. But Hardy's catastrophic injuries did not cause Defendants to reevaluate their practices. Instead, Defendants accelerated them.

10. In March 2026, nineteen-year-old Isis Sio fought MVP-represented Jocelyn Camarillo in an MVP-promoted bout that commentators viewed as an outrageous mismatch. Camarillo knocked Sio unconscious in the first round. Sio left the ring on a stretcher and soon entered a medically induced coma. Just one month later, in April 2026, another MVP fighter, Shadasia Green, suffered a brain bleed following a brutal MVP-promoted match that left her hospitalized. Green complained of head pain in the fourth round and cried out for help, yet the fight continued until the ninth round before officials stopped it. These incidents reflected a consistent pattern, not isolated mistakes. From Hardy, to Sio, to Green, Defendants repeatedly placed commercial interests ahead of fighter safety.

11. Hardy paid the price of Defendants' lack of care and concern for fighter safety. After the 2023 Serrano bout, her life and career changed permanently. She retired soon after the fight when she started experiencing vision loss and after doctors said that her symptoms reflected brain injury. She now has serious and lasting neurological damage, the kind of impairments no athlete should accept (or expects) as the price of a promoter's spectacle. Her injury was the foreseeable result of the Defendants placing a vulnerable fighter into a dangerous rematch while bypassing the protections meant to help her avoid exactly that risk. Though Hardy came to understand that the Serrano rematch had injured her, she did not know, and could not reasonably have known, that Defendants had wrongfully engineered that bout, because they concealed the nature of their role in procuring and controlling it.

12. This action seeks to hold Defendants accountable for the negligence, conflicts of interest, and safety failures that led to Hardy's harm. At bottom, the case presents a simple question: can Defendants profit from a fighter's body while evading the duties designed to protect that fighter from foreseeable, preventable injury? The answer is no. Defendants cannot

evade their duty of reasonable care through use of nominal intermediaries, conflicted arrangements, or self-serving claims of fighter advocacy while they disregarded established safeguards designed to protect boxer safety and welfare. The law does not permit promoters to ignore clear warning signs that a bout presents an unreasonable and foreseeable risk of serious harm. Defendants were negligent in proceeding with this grossly mismatched fight despite obvious indicators that Ms. Hardy faced heightened danger; they placed commercial interests above fighter safety.

13. Heather is a symbol of the harm caused by the system Jake Paul and MVP built. MVP and Paul exploited Heather, along with several other women in boxing, and exposed them to unimaginable danger. Heather brings this action to justly hold Defendants accountable for the harm they caused her. In so doing, she hopes to shift the culture in female boxing, promoting safety and humanity over treating these women as expendable commodities in pursuit of spectacle and profit.

## JURISDICTION, VENUE, AND TIMELINESS

14. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims that arise under federal law.

15. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy under Article III, arising from a common nucleus of operative facts.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District,

including, without limitation, the execution and/or performance of the agreements at issue and the conduct giving rise to Plaintiff's claims.

17. These claims are timely under the discovery rule and the doctrine of fraudulent concealment. Although Hardy became fully aware of the nature of her injuries on September 24, 2024, she did not and could not through reasonable diligence have discovered that the Defendants wrongfully caused those injuries. Defendants concealed the nature of their role in procuring and controlling the Hardy v. Serrano bout: they used Jordan Maldonado to pose as Serrano's channel, interposed Holden Boxing as a nominal promoter to obscure MVP's control, and structured the transaction to hide from both Ms. Hardy and her longtime promoter that Defendants had deceptively lured a vulnerable and compromised Heather into a mismatch that would more than likely (and in fact did) result in her extreme injury. Hardy first learned of the Defendants' concealed role, and of the facts giving rise to their liability, on March 20, 2026, when her counsel uncovered them from sources inside the professional boxing industry. Her claims therefore did not accrue until that date; in the alternative, Defendants' fraudulent concealment tolled limitations until then. The statute of limitations for Plaintiff's claims of gross negligence, negligent undertaking, negligence *per se*, and negligence is two years under Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a).

## THE PARTIES

18. Plaintiff Heather "The Heat" Hardy is a natural person who resides in Kings County, New York.

19. Defendant Jake Joseph Paul ("Paul") is a natural person and is a resident of Puerto Rico.

20. Defendant Bryce Holden ("Holden") is a natural person and is a resident of New York.

21. Defendant Holden Boxing LLC ("Holden Boxing") is a U.S. corporation with its principal place of business in Oklahoma.

22. Defendant Most Valuable Promotions, LLC ("MVP") is a U.S. corporation with its principal place of business in Puerto Rico.

## FACTUAL BACKGROUND

### I. The World of Professional Boxing

23. Professional boxing appears to be a fight between two athletes. In reality, long before two fighters enter the ring, an entire structure exists behind every bout. That structure serves to protect fighter safety, ensure fair competition, and prevent the business of boxing from overwhelming the health and welfare of the athletes whose bodies generate its profits.

24. At the center of every boxing event is the fighter. Fighters devote years, often decades, to developing the physical conditioning, technical skill, and psychological discipline necessary to compete at the professional level. And, yes, every fight carries some risk. But while there is risk, the systems put in place are meant to manage and minimize that risk and adequately protect fights and fighters. Those systems include protective laws, promoters, agents, state athletic commissions, glove manufacturers, and more. When those systems work properly, boxing is an enjoyable and thrilling sport. When they don't, boxing is a highway to brain injury.

25. Each of these protective systems play a different role. *First*, a manager or agent exists to protect the fighter's interests. When a fighter faces a dangerous career decision, the manager evaluates opportunities, assesses risk, negotiates compensation, reviews contractual terms, and serves as an independent advisor. The manager's role is particularly important

because they can protect fighters from ill-advised decisions that involve immediate financial rewards but can result in long-term physical damage.

26. *Second*, a promoter's role is fundamentally different than a manager's role, although in certain situations the same person fills both roles. Promoters organize boxing events, secure venues, negotiate broadcast agreements, obtain sponsorships, market fights, sell tickets, and generate revenue. Promoters make money when fights are commercially successful. Their economic incentives are therefore not always aligned with those of the fighters themselves. A bout that is highly profitable for a promoter may involve risks that an agent would caution a fighter against accepting.

27. For that reason, professional boxing has long recognized the need to maintain separation between those who protect fighters and those who profit from promoting fights. The distinction is so important that Congress enacted the Ali Act in part to address conflicts of interest and protect fighters from exploitative business practices. With the Ali Act, Congress intended to protect fighters from situations in which the individual responsible for advancing the fighter's interests was simultaneously motivated by the promoter's financial interests. Congress enacted a wall to, above all, protect fighters and maintain the integrity of the sport. To enforce these protections, Congress created a private civil right of action that authorizes any person injured by a violation of the Ali Act to bring suit in federal court and recover appropriate relief.[2] Congress also empowered the government to investigate and punish violations through substantial civil penalties and criminal sanctions, underscoring the importance of the Act's conflict-of-interest provisions and other fighter-protection requirements. The Ali Act therefore forms one of several complementary safeguards designed to protect fighters.

---

[2] 15 U.S.C. § 6309(d).

28. *Third*, state athletic commissions offer another layer of protection. Athletic commissions oversee professional boxing contests, enforce rules, supervise medical protocols, license participants, and protect the health and safety of competitors. Before a bout occurs, commissions rely upon accurate information from participants and promoters in making decisions regarding fighter eligibility and event approval.

29. *Fourth*, glove manufacturers provide yet more protection. Glove manufacturers design and produce the equipment that stands between boxers and some of the inherent dangers of the sport. Glove manufacturers bear responsibility for developing, testing, and manufacturing gloves that comply with applicable rules and safety standards and that perform as intended during training and competition. Fighters and regulators rely on glove manufacturers to deliver equipment that absorbs and distributes impact, protects the fighter's hands, and reduces the risk and severity of injury resulting from jabs. If there is careful design, quality control, gender-based safety testing, and adequate safety warnings, glove manufacturers help promote fighter safety and preserve the integrity of professional boxing.

30. However, when glove manufacturers produce or distribute gloves with defects, malfunctions, design flaws, manufacturing deficiencies, inadequate quality controls, or other conditions that compromise their intended performance, those gloves can amplify the very risks they should reduce. Defective or dysfunctional gloves can increase the likelihood and severity of injury and undermine confidence in the fairness and safety of the sport.[3]

---

[3] Plaintiff has a separate action pending in New York, *Hardy v. Dr. Nitin Sethi, et. al,* Index No. 655478/2025 ("New York Action"), which asserts product liability claims arising from progressive traumatic injuries sustained over the course of her boxing career due to purported defects in boxing equipment and related protective gear. That action concerns distinct allegations and claims asserted against different parties. While there may be some limited factual overlap, the New York Action materially differs from the case at bar.

31. *Fifth*, another form of protection comes from the weight-class system. Unlike most sports, boxing is a contest in which one participant may seriously physically injure another through repeated legal strikes. For that reason, modern boxing evolved into a series of weight divisions intended to ensure that competitors enter the ring with relatively comparable size, strength, power, and durability. Weight classes reduce obvious physical disparities, promote fighter safety, and preserve the integrity of competition.

32. The existence of weight classes contributes to what has made boxing compelling for generations. The sport is not a contest in which a larger, stronger athlete overwhelms a significantly smaller opponent through physical advantages alone. Rather, boxing seeks to pit similarly situated athletes against one another so that victory is determined by conditioning, preparation, fight intelligence, skill, courage, discipline, strategy, and execution. At its best, boxing is both physical and cerebral—a contest of tactics as much as force. Combat chess.

33. This competitive balance gives meaning to victory and indeed, the sport itself. When two evenly matched fighters meet in the ring, the outcome carries legitimacy because each athlete enters the contest without an obvious structural advantage. The champion earns recognition not because he or she was bigger, heavier, or stronger, but because he or she proved superior under substantially equal conditions. For centuries, audiences have embraced precisely this dynamic: two evenly matched gladiators testing their abilities against one another in a legitimate athletic contest which only the better fighter can win.

34. The same principle that enhances competitive legitimacy also enhances fighter safety. Weight classes, matchmaking standards, medical oversight, safe boxing equipment, and independent representation exist together as a network of protections designed to reduce the likelihood that one fighter will experience unnecessary and foreseeable harm.

35. When the system functions as intended, each participant performs a distinct role. Fighters fight. Managers protect fighters. Promoters promote events. Athletic commissions regulate contests and safeguard competitors. The separation of those functions exists for a reason. It is designed to prevent commercial interests from overriding the welfare of the athletes whose labor makes the industry possible.

36. The story of Heather Hardy is what happens when those safeguards fail. More specifically, Heather's story is about what happens when a promoter disregards laws and rules intended to protect fighters and ultimately values their own profit above a fighter's informed consent. MVP's improper conduct and disregard of appropriate rules culminated in the fateful Serrano rematch—a fight that ended Heather Hardy's professional boxing career and permanently altered the course of her life.

## II. MVP's Creation and Business Model

37. Jake Paul and Nakisa Bidarian ("Bidarian") founded MVP in 2021. Paul entered boxing from social media and entertainment; Bidarian brought institutional combat-sports experience, including prior senior roles at the Ultimate Fighting Championship ("UFC"). Together, they built MVP around a simple commercial premise: combine Paul's social-media audience, streaming-platform distribution, and spectacle-driven matchmaking to produce boxing events that could reach audiences beyond traditional boxing fans.[4]

38. For MVP's first major credibility move, it signed Amanda Serrano, one of the most accomplished female boxers in the sport. This gave MVP legitimacy beyond Paul's own fights. MVP then used Serrano's career, including the *Katie Taylor vs. Amanda Serrano* series,

---

[4] The Guardian, "Inside Jake Paul's MVP: the company changing boxing and powering Taylor-Serrano," https://www.theguardian.com/sport/2025/jul/14/jake-paul-mvp-katie-taylor-serrano-msg-boxing.

to position itself publicly as a disruptive, "fighter-first" promotion company with a particular emphasis on women's boxing.[5] (The reality, as discussed below, was much darker.) At the same time, MVP's commercial engine remained closely tied to Paul's own fights, which repeatedly paired Paul with opponents selected for spectacle, name recognition, age disparity, size disparity, or crossover appeal.

39. MVP's rise spawned from a deliberate strategy by Paul and MVP to blur the line between regulated prizefighting and influencer entertainment. MVP sold fights not merely as athletic contests, but as mass-media events. The company promoted events to audiences who might not otherwise follow boxing, often through narratives designed to generate controversy: influencer versus former champion; young fighter versus aging legend; cruiserweight-sized Paul versus a significantly smaller elite boxer; or celebrity fight card packaged as a mainstream streaming spectacle.

40. That model created obvious safety and regulatory risks. The more MVP's business depended on unusual matchups, the more important state athletic commissions became. The commissions were the gatekeepers deciding whether an atypical bout would proceed at all. But the commissions in different states, like the states themselves, differ greatly in the strictness of their rules (or lack thereof). MVP deliberately shopped for fight venues located in jurisdictions with less stringent safety requirements so those athletic commissions could effectively rubber stamp its unsafe fights. The wider professional boxing community often recognized these matchups as absurd and dangerous. Undeterred by the views of experts,

---

[5] Marc Raimondi, *Amanda Serrano signs with Jake Paul's Most Valuable Promotions*, ESPN (Sep. 30, 2021) https://www.espn.com/boxing/story/_/id/32310873/amanda-serrano-signs-jake-paul-most-valuable-promotions.

Jake Paul and MVP's malfeasance and desire to have the fight by any means necessary put all its fighters at risk. This would eventually include Heather Hardy.

## III. MVP's Pattern: Safety Subordinated to Spectacle

### a. Forum Shopping and Rule Bending

41. MVP's fights followed a similar pattern. MVP first identified a commercially valuable matchup. If the matchup presented regulatory or safety concerns, MVP sought a jurisdiction and rule structure that would allow the event to proceed; this is known as *forum shopping*. Rather than picking venues as a simple business decision (for example, setting a fight in Las Vegas during a busy season, such as March Madness), forum shopping means intentionally picking a location that will allow an otherwise unsafe fight. Forum shopping is especially dangerous in professional boxing because the promoter's choice of jurisdiction determines the medical testing, licensing, fighter matchmaking, disclosure obligations, judging, and ringside-safety regime under which the fights proceed. A promoter that repeatedly relocates events to states with less stringent oversight—or leaves a jurisdiction after regulators raise safety, matchmaking, or other medical concerns—may claim formal compliance with the law of the new host state, but the practice subverts the very purpose of boxing regulation. (Obviously, a promoter who intentionally relocates a bout after the regulators raise safety concerns knows that this bout is dangerous for at least one fighter.)

42. Congress has expressly recognized this problem. In passing the Ali Act, Congress found that promoters can exploit boxing's fragmented regulatory structure by holding events in states with weaker oversight, and that such practices harm boxers and competition in the sport. For example, New York requires professional boxers to undergo MRI screening as part of its medical oversight regime and requires cornermen, who monitor fighters during bouts and provide critical safety-related assistance, to obtain licenses and satisfy credentialing

requirements.[6] Texas, by contrast, does not automatically require comparable MRI screening and abolished state licensing requirements for cornermen in 2021, thereby permitting unlicensed and potentially unvetted individuals to occupy positions that directly affect fighter health and safety.[7] Allowing promoters or other interested parties to select forums based on regulatory convenience undermines the protective purposes of stricter jurisdictions such as New York and creates incentives to evade safety measures intended to protect fighters from preventable harm. While moving a bout from one state to another is not *per se* unlawful, doing so to evade stricter safety rules, testing requirements, or matchmaking objections can evidence negligence, recklessness, bad faith, and deceptive business practices—particularly where a promoter knew that one commission had identified a safety problem and then sought a more permissive forum without making any safety adjustments. This was MVP's model.

43. The result of Jake Paul and MVP's behavior was the creation of a business model that depends on locating the regulatory path of least resistance for fights that would predictably draw scrutiny in states with more stringent protocols and safeguards for fighter safety. The results have been devastating.

44. MVP's handling of the *Jake Paul vs. Mike Tyson* fight on November 15, 2024, illustrates its pattern of forum shopping in reckless disregard for fighter safety. Tyson was fifty-eight years old. Paul was just twenty-seven. This was the largest age difference in the history of

---

[6] N.Y. State Athletic Comm'n, *Medical Standards for Combat Sports Professionals* (Nov. 2022), https://dos.ny.gov/system/files/documents/2024/05/nysac-medical-manual-5-8-2484.pdf.; *see also* N.Y. Comp. Codes R. & Regs. Tit. 19 § 207.1.

[7] *Combative Sports Frequently Asked Questions*, Tex. Dep't of Licensing & Regulation, https://www.tdlr.texas.gov/sports/sportsfaq.htm [perma.cc] (last visited July 29, 2026).

a legally sanctioned professional boxing fight.[8] Tyson had not fought a sanctioned professional bout in nearly two decades. The safety concerns compounded when Tyson suffered a bleeding ulcer in May 2024, forcing the postponement of the fight from its original July 20 date to November 15.[9] Tyson later revealed that this medical emergency left him vomiting blood and ultimately losing twenty-six pounds, underscoring the unconscionable health risks surrounding the event.[10] Tyson's health condition should have resulted in the cancellation of the fight, but MVP and Paul would not be denied. The spectacle was a young, notoriously disliked YouTuber versus an elderly (and compromised) former heavyweight champion whose fame and commercial value were central to the event.

45. MVP pursued sanctioning in Texas, a state with less stringent guidelines surrounding boxing matches compared to other venues like New York or California. The Texas Department of Licensing and Regulation approved the fight as a sanctioned professional bout. The distinction between a sanctioned professional bout and an exhibition matters. A professional bout is an official contest: the result counts on the fighters' records, promoters market the event as legitimate competition, and the fighters enter the ring under the full imprimatur of state approval. An exhibition, by contrast, is ordinarily understood as a limited demonstration or entertainment contest with reduced competitive stakes, modified rules, and less consequence for a fighter's official record. When promoters preserve the physical danger, public spectacle, and

[8] Sanjesh Singh, *What is the biggest age gap in a boxing match? Where Tyson-Paul ranks*, NBC 5 Dallas-Fort Worth (Nov. 14, 2024), https://www.nbcdfw.com/news/sports/biggest-age-gap-boxing-match-mike-tyson-jake-paul/3697832/.

[9] Josh Peter, *Mike Tyson Says He Lost 26 Pounds After Ulcer, Provides Gory Details of Medical Emergency*, USA Today (Nov. 7, 2024), https://www.usatoday.com/story/sports/boxing/2024/11/07/mike-tyson-ulcer-details-jake-paul-fight/76052652007/.

[10] *Id.*

commercial value of a professional fight while using altered rules or labels to secure regulatory approval, the label does not eliminate the safety risk. MVP modified the *Tyson* fight from ordinary "Heavyweight" rules, which normally feature ten to twelve three-minute rounds and 10-ounce gloves, to eight two-minute rounds and 14-ounce gloves.[11] Upon information and belief, Texas approved this fight only after MVP made these modifications. With those modifications, the bout counted as a professional fight and MVP marketed it as a legitimate sporting event with an official result that would count on both fighter's records.[12]

46. Why does this matter? *First*, sports commentators and other observers viewed the fight as medically and competitively suspect. *Second*, upon information and belief, most jurisdictions would have rejected this fight, but MVP sought out Texas because it knew the Texas Commission would approve the fight. *Third*, the fight put Tyson at significant risk at his age and Jake Paul is lucky his recklessness didn't lead to more serious injury for Tyson in the bout. Unfortunately, in other matchups which Paul and MVP structured, the mismatched fighter was not so lucky.

47. MVP's planned *Jake Paul vs. Gervonta Davis* fight, originally scheduled for November 14, 2025, showed the same pattern of forum shopping in a sharper form. At the time, Davis was an elite "Lightweight," which has an upper limit of 135 pounds. Paul had been competing roughly at "Cruiserweight" size, where the upper limit is 200 pounds. The proposed

---

[11] Reuters, *Tyson v Paul sanctioned as professional fight*, (Apr. 29, 2024), https://www.reuters.com/sports/tyson-v-paul-sanctioned-professional-fight-2024-04-29/.

[12] Margaret Fleming, *Why Texas Sanctioned Jake Paul vs. Mike Tyson as a Pro Fight*, Front Office Sports (Apr. 29, 2024) https://frontofficesports.com/texas-paul-tyson-sanctioned-fight/. Quotes from article: "Fighters usually compete in three-minute rounds and wear 10-ounce gloves, meaning Tyson and Paul are set to get more protection and rest than during a standard fight. The shorter rounds will be easier for Tyson, who will be 58 for the bout, while the heavier gloves could make a classic Tyson knockout punch less likely to land with devastating force."

matchup therefore involved a massive size and weight disparity. The fight was initially expected to take place in Georgia, but MVP withdrew its request for Georgia permits and rule waivers after pushback from the Georgia Athletic and Entertainment Commission.[13] "This is the dumbest [expletive] I've ever heard," said Rick Thompson, chairman of the Georgia Athletic and Entertainment Commission that needed to approve the fight. "It's a money grabber, and I'm not OK with that."[14] Thompson said he opposed the fight as a sanctioned professional boxing match or even as just an exhibition. Regulators in Georgia were rightfully concerned about the massive weight disparity between Paul and Davis. So, what did Paul and MVP do? They moved the event to Florida, which approved the fight as an "exhibition."[15]

48. Though masked as an "exhibition," the Florida version of the match still preserved many features of a professional fight. It was scheduled for ten three-minute rounds, it included judges, and it allowed knockouts and technical knockouts to end the bout.[16] Also, Netflix would globally stream it. Although the result would not count on the fighters' professional records, the event still placed two fighters with a dramatic size disparity into a combat-sports contest designed to produce a decisive and, more importantly for Paul, marketable outcome. As the obvious beneficiary of the mismatch, Paul cared naught about the safety of the mismatch. Paul had a guaranteed win both in the ring and at the bank.

---

[13] Shakiel Mahjouri, *Jake Paul vs. Gervonta Davis fight officially moved to Miami after Atlanta plans fall through*, CBS Sports (Sep. 17, 2025) https://www.cbssports.com/boxing/news/jake-paul-vs-gervonta-davis-fight-officially-moved-to-miami-after-atlanta-plans-fall-through/.

[14] Josh Peter, *Jake Paul vs. Gervonta Davis Fight Blasted by boxing Official*, USA Today (Sep. 9, 2025) https://www.usatoday.com/story/sports/boxing/2025/09/08/jake-paul-vs-gervonta-davis-fight-blasted-by-boxing-official/86050467007/.

[15] Damon Martin, *Jake Paul vs. Tank Davis officially set as exhibition; glove size, rounds and other rules revealed*, MMA Fighting (Oct. 10, 2025) https://www.mmafighting.com/boxing/449427/jake-paul-vs-tank-davis-officially-set-as-exhibition-glove-size-rounds-and-other-rules-revealed.

[16] *Id.*

49. The Gervonta Davis sequence supports a reasonable inference that MVP selected or changed jurisdictions based on which states would approve its curated mismatch. When Georgia proved resistant and voiced serious safety concerns, MVP did not abandon the bout on safety grounds. It simply picked up and moved the event to Florida and slapped on an "exhibition" label that still allowed fight-ending knockouts. That is classic regulatory arbitrage: preserving the commercial product while adapting the regulatory label. An unrelated, untimely civil lawsuit against Davis ultimately scrapped the *Jake Paul vs. Gervonta Davis* bout just days before the fight.[17] But for this last-minute coincidental cancellation, the mismatch would have proceeded, likely with devastating results.

50. Paul and MVP's matches reflect their true priority: maximizing attention through dubious and controversial pairings. MVP's business model did not merely create unusual entertainment events; it created foreseeable fighter-safety risks. Those risks appeared in at least four recurring ways: (1) putting non-boxers or crossover athletes into sanctioned combat events despite obvious medical concerns; (2) promoting fights involving dramatic mismatches in age, size, experience, or competitive context; (3) elevating women's boxing while simultaneously pushing for longer women's rounds despite unresolved neurological-safety concerns specific to women; and (4) perhaps most wicked, continuing to treat serious head trauma as an acceptable byproduct of the spectacle.

51. Upon information and belief, the 2023 Serrano-Hardy bout clearly illustrates MVP's willingness to sidestep stricter regulatory oversight in favor of jurisdictions with more permissive approval standards. Even before the ill-fated fight, Heather Hardy had a documented

---

[17] Elizabeth Flores, *Why Was Jake Paul vs. Gervonta Davis Netflix Boxing Fight Canceled?*, Yahoo! Sports (Nov. 5, 2025), https://sports.yahoo.com/article/why-jake-paul-vs-gevonta-222926318.html.

history of significant head trauma and diminished competitive ability. Serrano, on the other hand, had a documented history of slugging away at opponents' heads, packing the hardest punch among women boxers. Thus, this matchup posed medical and competitive concerns that, upon information and belief, would have forced New York regulators to step in, especially in light of Ms. Hardy's medical history. While the first match between Hardy and Serrano was in New York, MVP moved this rematch to Texas which, as mentioned above, has noticeably more relaxed regulations than New York. Upon information and belief, this was a deliberate move by MVP and Jake Paul to avoid state scrutiny because they knew this rematch was imbalanced.

b. Orchestrating Mismatches and Disregarding Health Concerns

52. Jake Paul and MVP regularly scheduled inappropriate, imbalanced matchups between fighters. These fights, as described below, repeatedly raised a key safety question: not merely whether a fight should proceed, but whether MVP's events adequately protected fighters once visible danger emerged inside the ring. A fighter does not need to lose consciousness for a bout to become dangerous. Fatigue, repeated head shots, deteriorating defense, delayed reactions, and visible distress are all warning signs. By the time a fighter leaves the ring on a stretcher and doctors diagnose a brain bleed, the safety system has already failed in its most basic function: preventing a fight from continuing into catastrophic neurological injury.

53. Jake Paul and MVP's matchups regularly put fighters, including Heather Hardy, in danger that went beyond the normal reasonable expectations of harm that professional boxers expect. On multiple occasions, MVP's disregard for safety and appropriate matchmaking directly led to fighters suffering serious and avoidable injuries. This includes Heather Hardy, but she was not the first.

*i. Frank Gore vs. Deron Williams and the Questionable MRI*

54. The *Frank Gore vs. Deron Williams* bout further illustrates Jake Paul and MVP's pattern. Neither fighter was a professional boxer. Gore was a former NFL running back who had spent sixteen seasons in a collision sport. Williams was a former NBA player also making a boxing debut. MVP and Paul put their fight on the *Jake Paul vs. Tyron Woodley* undercard in Tampa, Florida.[18] MVP initially planned the bout as a professional boxing match, but for safety reasons, the Florida State Athletic Commission intervened shortly before the event and changed it to an exhibition; yet another example of MVP and Jake Paul disregarding fighter safety and moving forward despite safety concerns.[19] The commission-sanctioned exhibition declared a winner and functioned as part of the televised combat-sports product sold to consumers.

55. After the fight, *Yahoo Sports* reported that Gore had a "questionable brain MRI" before the bout.[20] According to that reporting, Gore's MRI showed multiple white spots, which is indicative of cumulative brain damage from repetitive head impacts.[21] This matter drew concern from Mike Mazzulli, president of the Association of Boxing Commissions ("ABC"). Mazzulli stated that the ABC "stands always for fighter safety" and that its medical committee was available to assist states in exactly this type of case.[22] Other outlets likewise reported that

---

[18] NBC Sports Staff, *Twitter Reacts to Deron Williams Beating Frank Gore in Boxing Match*, NBC Sports Phila. (Dec. 18, 2021), https://www.nbcsportsphiladelphia.com/nba/twitter-reacts-to-deron-williams-beating-frank-gore-in-boxing-match/195409/.

[19] Scott Christ, *Deron Williams vs Frank Gore Fight Officially an Exhibition Bout*, Bad Left Hook (Dec. 18, 2021), https://www.badlefthook.com/2021/12/18/22843510/deron-williams-vs-frank-gore-fight-officially-exhibition-bout-paul-woodley-boxing-news-2021.

[20] Kevin Iole, *Florida cleared Frank Gore to fight Deron Williams despite questionable brain MRI*, Yahoo Sports (Feb. 2, 2022) https://sports.yahoo.com/florida-cleared-frank-gore-to-fight-deron-williams-despite-questionable-brain-mri-232006175.html.

[21] Wanyong Shin et al., *Diffusion Measures Indicate Fight Exposure–Related Damage to Cerebral White Matter*, 35 Am. J. Neuroradiology 285 (2014), https://pmc.ncbi.nlm.nih.gov/articles/PMC7965766/.

[22] Yahoo Sports, *supra* note 20.

Gore had multiple white spots on his MRI and that the issue created fighter-safety controversy, but that Gore ultimately fought after being cleared by regulators.[23]

56. MVP knew or should have known about this MRI. Certainly, if MVP cared about fighter safety and prioritized proper testing, it would have been aware of this test result. Despite this, it went forward with an event which placed a retired collision-sport athlete with a publicly reported questionable brain MRI into a boxing match on a Jake Paul card. That type of risk is a clear red flag to a responsible promoter. MVP should never have packaged a fighter with years of NFL head-impact exposure, no professional boxing record, and abnormal brain-imaging concerns into a celebrity boxing spectacle merely because the fight was commercially marketable.

57. The *Gore* bout also fits MVP's broader pattern of regulatory maneuvering. MVP kept going even after the State of Florida intervened at the very last minute. But the practical risk to Gore's brain did not disappear because the label changed. An exhibition boxing match typically still involves head punches, knockdowns, traumatic brain injury, and long-term neurological harm. Calling the fight an exhibition did not make it safe, but it did keep it profitable for MVP.

*ii. Isis Sio and the Knockout by MVP Fighter Jocelyn Camarillo*

58. Another MVP mismatch that led to a serious safety incident involved nineteen-year-old female fighter Isis Sio. Sio fought Jocelyn Camarillo on a March 2026 ProBoxTV card in San Bernardino, California. Camarillo was an MVP fighter. She knocked Sio unconscious in the first round, after approximately 78 seconds. Sio left the ring on a stretcher. Doctors placed

---

[23] The Sporting News, "Frank Gore had 'Questionable Brain MRI' heading into Deron Williams fight," https://www.sportingnews.com/us/boxing/news/frank-gore-questionable-brain-mri-deron-williams-fight/lmaeatetzgsr9ahyebvgozp9.

Sio in a medically induced coma and treated her in the intensive care unit.[24] Sio was a young "Junior flyweight" with a 1-3 professional record. Reports stated that the Camarillo loss was Sio's second consecutive stoppage loss and that she had been knocked out in January 2026, less than two months earlier.[25]

59. Camarillo, on the other hand, entered the match undefeated. According to a *Sports Illustrated* report, the knockout caused observers to question why Sio was in the ring at all, given her record, recent activity, and prior stoppage losses.[26] This incident matters even if MVP was not the sole promoter of the bout. MVP publicly promoted Camarillo, issued a public statement after Sio's injury, and benefited from Camarillo's development as part of MVP's women's boxing project.[27] The incident therefore illustrates the foreseeable danger of using underdeveloped, low-record, or recently stopped fighters as opponents for prospects on televised or streamed cards. A one-sided developmental matchup is not just a competitive mismatch. In boxing, it represents a serious risk of bodily harm and even potentially death. Jake Paul and MVP knew this, and they did not care. Paul's business was spectacle. A fighter taken out of the ring in a stretcher? That's spectacle.

60. Sio's injury undercuts MVP's public safety narrative. MVP has repeatedly positioned itself as a force for good in women's boxing. But increasing the visibility of women's

---

[24] Andreas Hale, *Women's junior flyweight boxer Isis Sio in coma after knockout*, ESPN (Mar. 22, 2026), https://www.espn.com/boxing/story/_/id/48281039/women-junior-flyweight-boxer-isis-sio-coma-knockout.

[25] Darshan Desai, *19-year-old Isis Sio emerges from medically induced coma after vicious KO loss*," (Mar. 23, 2026), https://sports.yahoo.com/boxing/article/19-year-old-isis-sio-emerges-from-medically-induced-coma-after-vicious-ko-loss-175453874.html.

[26] Jaren Kawada, *19-Year-Old Isis Sio Awakes From Coma Two Days After Brutal Knockout Loss*, Sports Illustrated (Mar. 23, 2026), https://www.si.com/fannation/boxing/19-year-old-isis-sio-awakes-from-coma-two-days-after-brutal-knockout-loss-.

[27] *Id.*

boxing does not excuse placing young or vulnerable fighters in unsafe matchups. If anything, a promoter claiming to lead women's boxing has a heightened responsibility to ensure that opponents are not being used as disposable stepping stones for more marketable fighters. In reality, MVP's disregard for safety denigrated women's boxing. Unfortunately for Sio, that was how Jake Paul and MVP did business.

*iii. Shadasia Green's Brain Bleed After the Lani Daniels Fight*

61. On April 17, 2026, Jake Paul and MVP would put another female boxer in peril. This was the *Shadasia Green vs. Lani Daniels* fight, which provides another example of Jake Paul and MVP endangering female fighters. Green, an MVP fighter and former unified super-middleweight champion, fought Lani Daniels at The Theater at Madison Square Garden. How did that fight go? Officials stopped Green's fight in the ninth round, paramedics removed her from the ring on a stretcher and hospitalized her, and she later disclosed that she suffered a brain bleed.

62. *ESPN* reported that Green remained in the ICU after the fight and that she was placed under indefinite suspension by the New York State Athletic Commission pending neurological clearance.[28] Other reporting described Green as visibly exhausted late in the fight before Daniels overwhelmed her and the referee intervened.[29] If you watch the fight, it is undisputable that in the last few rounds, Greens' exhaustion and disorientation is palpable.

---

[28] Andreas Hale, *Shadasia Green still in ICU, suffered brain bleed in loss,* ESPN (Apr. 19, 2026), https://www.espn.com/boxing/story/_/id/48535702/shadasia-green-icu-suffered-brain-bleed-loss.

[29] Scott Christ, *Shadasia Green had brain bleed, 'no surgery needed,'* Bad Left Hook (Apr. 20, 2026), https://www.badlefthook.com/womens-combat/114876/shadasia-green-had-brain-bleed-no-surgery-needed.

Officials stopped the fight in Round 9 after Daniels landed a slew of punches to Green's head, leading the referee to halt the bout 32 seconds into the round after Green did not respond.

63. Green herself publicly stated that she suffered a brain bleed and doctors treated her with medication rather than surgery.[30] Green shared more publicly, including via her X (f/k/a Twitter) account, where she stated, "From round 4 to the end I was complaining about my head [sic]!" only three days after the fight.[31] This is further proof of Jake Paul and MVP's recklessness in regard to the safety of their own fighters and the matches they sanctioned.

64. Green's fight bears a haunting similarity to Hardy's fight against Serrano. Both followed the same pattern of Jake Paul and MVP creating a mismatch in favor of spectacle, of treating the female boxers as objects to be knocked down in the interest of a bigger, more lucrative main event. Their bodies were simply sacrifices on the altar of streaming entertainment, not to be cared for or respected. Paul and MVP dealt with Hardy similarly when they organized the Serrano rematch, as discussed below.[32]

c. MVP's Push for Three-Minute Rounds in Women's Boxing

65. MVP's safety issues are also structural. MVP has aggressively aligned itself with the movement for women to fight three-minute rounds, including through Amanda Serrano and other MVP-associated female fighters. The public framing is equality: the rules should permit women to fight under the same rules as men. That argument has surface appeal. But in combat sports, equal opportunity (if it is that) is only half the story.

66. Women's championship boxing traditionally uses ten two-minute rounds. MVP-linked fighters have pushed for twelve three-minute rounds, the men's championship format.

---

[30] *Id.*
[31] *See* **Exhibit A**, Shadasia Green's post on X.com from April 20, 2026.
[32] *See infra* paras. 101–107.

That change would increase scheduled fight time from 20 minutes to 36 minutes. In other words, it would increase potential fight exposure by 80 percent. That additional exposure matters. More time in the ring means more opportunities for head impacts, more cumulative fatigue, more diminished defense, and more late-round neurological danger.

67. The danger present is beyond speculation; indeed, MVP's own work to push three-minute rounds has already yielded catastrophic results. The *Shadasia Green vs. Lani Daniels* fight ended abruptly and Green entered the hospital with a brain bleed in no small part because of MVP's insistence on the bout utilizing three-minute rounds. An analysis of the fight reveals that Daniels landed far more punches between minutes two and three of Rounds 6 through 9. During that period, there was a clear escalation in both frequency and impact of Daniels' blows to Green's head. This is consistent with fatigue-related defensive breakdown. During these one-minute intervals in the later rounds of the fight, Green absorbed a markedly higher volume of clean strikes compared to the opening rounds, with a noticeable clustering of unanswered combinations in the final 20–30 seconds. This pattern suggests that as the later rounds progressed, Green's reaction time slowed and her guard integrity deteriorated, allowing Daniels to land repeated head shots with limited resistance.

68. This minute-specific spike in vulnerability provides a concrete basis for arguing against extending women's boxing rounds to three minutes. The third minute is a period where fighters are more exposed to sustained, unmitigated strikes due to fatigue. Increasing round length therefore disproportionately increases the likelihood of cumulative head trauma and injury, as female athletes endure prolonged periods of reduced defensive effectiveness. In this context, maintaining shorter rounds operates as a protective mechanism, limiting the duration of peak vulnerability and reducing the total number of significant blows absorbed in a single round.

69. The medical literature also gives reason for caution. A 2024 review of concussions in female contact-sport athletes found that female athletes had a higher risk of sustaining concussions, even though they received fewer impacts with lower magnitude.[33] Other peer-reviewed articles have reported that female athletes are more susceptible to sport-related concussions and can experience worse outcomes than male athletes.[34] A 2019 study on sex-based concussion incidence likewise noted that females are more likely to sustain sport-related concussions than males in comparable sports.[35]

70. The boxing-specific evidence is more nuanced, but it does not eliminate the concern. A 2025 discussion of a neurological study reported that men and women had almost identical boxing concussion rates when adjusted for minutes boxed.[36] That finding cuts against the idea that longer women's rounds are harmless. If concussion risk is meaningfully related to minutes boxed, increasing women's championship fights from 20 scheduled minutes to 36 scheduled minutes predictably increases exposure to the same core risk.

71. The World Boxing Council ("WBC") has opposed three-minute rounds for women on safety grounds. WBC president Mauricio Sulaiman defended two-minute rounds by citing fighter safety and well-being, while Amanda Serrano (represented by MVP) and other

[33] Concussion in Female Athletes of Contact Sports: A Scoping Review. Orthop. J. Sports Med. (October 16, 2024), "Concussion in Female Athletes of Contact Sports," https://pmc.ncbi.nlm.nih.gov/articles/PMC11483826/.

[34] Sport-Related Concussion in Female Athletes: A Systematic Review. Orthop. J. Sports Med. (July 16, 2020), "Sport-Related Concussion in Female Athletes: A Systematic Review," https://pmc.ncbi.nlm.nih.gov/articles/PMC7366411/.

[35] Sex-Based Differences in the Incidence of Sports-Related Concussion: Systematic Review and Meta-analysis. Sports Health (September 30, 2019), "Sex-Based Differences in the Incidence of Sports-Related Concussion: Systematic Review and Meta-analysis," https://pmc.ncbi.nlm.nih.gov/articles/PMC6822209/.

[36] Combat Sports Law, "Study – Male and Female Boxers Suffer Almost Identical Concussion Rates," https://combatsportslaw.com/2025/04/10/study-male-and-female-boxers-suffer-almost-identical-concussion-rates/.

fighters objected and sought the right to compete under men's rules.[37] WBC has stood firm against sanctioning three-minute women's fights, despite pressure from some promoters like MVP.

72. MVP can advocate for women's boxing. It cannot ignore the medical consequences of its advocacy. A promoter that pushes longer rounds in women's boxing must account for the increased exposure to head trauma, the unsettled medical literature, the WBC's safety objections, and the real-world injuries occurring on women's fight cards. MVP instead treated three-minute rounds as a branding issue: a progressive, disruptive, equality-based selling point. In doing so, it subordinated neurological safety to marketable narrative. This was to support Jake Paul and MVP's bottom line: making a spectacle to increase ticket sales, pay-per-view sales, and online impressions by increasing the danger to women and to the sport of boxing in general. Longer rounds also mean more profits for MVP and Jake Paul; this presents another incentive for MVP's position. MVP and Jake Paul prioritized these profits over safety.

73. Although three-minute rounds did not occur in connection with Hardy's bout, MVP's insistence sheds light on MVP's state of mind, priorities, and approach to fighter safety. They show that MVP repeatedly embraced conduct that prioritized business objectives over fighter protection, tolerated unnecessary dangers that went beyond those inherent in combat sports, and disregarded foreseeable risks of serious injury. This pattern of conduct supports a finding of gross negligence and demonstrates a conscious indifference to the safety and well-being of the fighters who depended on MVP to act responsibly.

---

[37] Reuters, *Cameron vacates WBC title in protest against men's and women's rules*, (Oct. 31, 2025) https://www.reuters.com/sports/cameron-vacates-wbc-title-protest-against-mens-womens-rules-2025-10-31/.

74. Jake Paul and MVP's conduct was unreasonable. Combat sports are inherently dangerous, but promoters still have duties. They must not increase risks unnecessarily. They must not use regulatory labels to obscure real danger. They must not place vulnerable fighters into unsafe matchmaking. They must not turn head trauma into a cost of doing business. MVP and Jake Paul had the resources, sophistication, and industry knowledge to understand these risks. They did not care. This was their standard of practice when they pulled in Heather Hardy to their dangerous game.

## IV. Bryce Holden and MVP's Use of a Nominal Licensed Promoter

75. MVP did not operate alone. For multiple Jake Paul and MVP events, MVP used Bryce Holden and Holden Boxing LLC as the licensed or official promoter of record. That relationship was central to Defendants' regulatory structure. Bryce Holden is associated with the now-defunct Holden Boxing, a boxing-promotion entity that appeared repeatedly in connection with MVP events.[38] Holden was the president of Holden Boxing and was the promoter of *Serrano vs. Hardy* in 2023*,* among many other prominent MVP events.[39]

76. Understanding Holden's role, however, requires context. MVP and Jake Paul, not Holden, were the public-facing commercial engine behind the events. Simply, MVP put on a Holden "mask" while it, in reality, promoted the events. MVP supplied the brand, the media narrative, and the streaming or pay-per-view platform relationships. Meanwhile, Holden Boxing

---

[38] BoxRec, "Bryce Holden," https://boxrec.com/en/promoter/1085030. *BoxRec* identifies Bryce Holden as a promoter associated with Holden Boxing, with an inactive promoter profile listing a career period of 2021 through 2024.
[39] Texas Department of Licensing and Regulation, "11-15-24-43467-43468-HOLDEN-ARLINGTON.pdf," https://www.tdlr.texas.gov/sports/results/11-15-24-43467-43468-HOLDEN-ARLINGTON.pdf.

acted as the "licensed promoter" or "promoter" for the same events.[40] In practice, that was far from the reality.

77. To be clear, "licensed promoter" is not a meaningless label. There is legal relevance to the "promoter" of record for a particular fight. State athletic commissions regulate licensed promoters; they do not regulate executive producers or commercial juggernauts. If MVP selected unusual or high-risk fights, but placed Holden Boxing in the formal licensed-promoter role, then MVP could attempt to preserve the benefits of promotion (all the money) while shifting regulatory responsibility (all the liability) to the nominal promoter of record. That arrangement would permit MVP and Paul to control the spectacle while using Holden Boxing as the formal entity interfacing with commissions, licensing paperwork, and event approvals. For MVP and Paul—who were acting without any care for the safety of fighters—this arrangement created a convenient liability shield.

78. MVP and Paul relied on Holden Boxing as the licensed promoter precisely because Holden Boxing could absorb the regulatory and legal exposure associated with the bouts while MVP retained the benefits of controlling them. If a commission raised concerns, a licensing issue arose, or a fighter suffered harm as a result of matchmaking decisions, the promoter of record (Holden Boxing) would be the entity expected to answer first. If a boxer suffered a catastrophic injury as a result of a mismatched or otherwise dangerous bout, Holden Boxing would be the entity immediately facing scrutiny from potential claimants. MVP and

---

[40] Paramount Press Express / Showtime, *Undefeated Pro Boxer Jake Paul and Unified World Champion Amanda Serrano to Headline Madison Square Garden on Saturday, August 6 Live on Showtime PPV*, https://www.paramountpressexpress.com/showtime/releases/?view=100517-undefeated-pro-boxer-jake-paul-and-unified-world-champion-amanda-serrano-to-headline-madison-square-garden-on-saturday-august-6-live-on-showtime-ppv.

Paul, meanwhile, could continue to reap the financial benefits of the event while remaining insulated from many of the consequences ordinarily associated with a promoter's conduct.

79. MVP has successfully worn the flimsy Holden mask for years. By shrewdly placing Holden Boxing in that role, MVP and Paul could pursue increasingly controversial, unconventional, or high-risk events while insulating themselves from the regulatory and legal consequences that ordinarily accompany a promoter's decisions. If one of MVP's carefully crafted spectacles turned into a train wreck, Holden Boxing, not MVP, would be the entity left standing before commissions, responding to inquiries, and bearing the fallout. Meanwhile, Paul and MVP would be free to count their towers of coins like cartoon villains.

80. Critically, being a promoter requires actual promotion. Holden and Holden Boxing did not do that. Upon information and belief, Jake Paul and MVP had complete control over the direction and promotion of the bouts. Holden Boxing was a shell entity that MVP/Jake Paul controlled. MVP and Jake Paul controlled or substantially directed the commercial concept, fighter selection, public promotion, media partnerships, and event packaging, while Holden Boxing supplied nothing more than nominal licensing, acting as the entity through which state commissions recognized the event. By doing this, the Holden name was essentially a license for hire. Public materials repeatedly divide the roles in exactly that way: MVP produced or presented the event; Jake Paul and Bidarian served as executive producers; Holden Boxing served as the licensed promoter. The obvious inference is that Holden and Holden Boxing acted at MVP's direction, for MVP's benefit, and as part of MVP's regulatory apparatus. The observable conduct of Holden and MVP made this obvious, and it was well known throughout the industry.

81. The same strawman structure appeared in other Jake Paul/MVP events. For *Jake Paul vs. Tyron Woodley* in Cleveland in August 2021, the event was co-produced by Showtime Pay-Per-View ("PPV") and MVP and promoted by Holden.[41] For *Jake Paul vs. Anderson Silva* in October 2022, published promotional materials stated that the event was co-produced by Showtime PPV and MVP and promoted by Holden Boxing.[42] Event databases likewise listed *Jake Paul vs. Anderson Silva* as an MVP promotion with Holden Boxing as "co-promoter."[43] For the ultimately-cancelled fight, *Jake Paul vs. Hasim Rahman Jr.* and *Amanda Serrano vs. Brenda Carabajal*, multiple sources again identified MVP as the producing entity and Holden Boxing as the licensed promoter.[44]

82. In June 2022, Showtime and Paramount announced a Jake Paul and Amanda Serrano event at Madison Square Garden. The release stated that MVP presented the event, co-produced by Showtime PPV, and that Holden Boxing would be the licensed promoter. The same release stated that Jake Paul and Bidarian would serve as executive producers.[45] In July 2022, further promotional materials for the same event again stated that Showtime PPV and

---

[41] Rocket Arena, *Trio of Explosive Matchups Round Out Jake Paul vs. Tyron Woodley Showtime PPV Fight Card on Sunday, August 29*, https://www.rocketarena.com/news/detail/paul-vs-woodley-update-210802.
[42] PhilBoxing, *NFL Star Le'Veon Bell to Face UFC Knockout Artist Uriah Hall in Professional Boxing Match Saturday, October 29*, https://philboxing.com/news/story-164041.html.
[43] Tapology, *Paul vs. Silva*, https://www.tapology.com/fightcenter/events/92580-paul-vs-silva.
[44] Press Release, Paramount Press Express, *Undefeated Pro Boxer Jake Paul and Unified World Champion Amanda Serrano to Headline Madison Square Garden on Saturday, August 6 Live on Showtime PPV* (June 15, 2022), https://www.paramountpressexpress.com/showtime/releases/?view=100517-undefeated-pro-boxer-jake-paul-and-unified-world-champion-amanda-serrano-to-headline-madison-square-garden-on-saturday-august-6-live-on-showtime-ppv.
[45] *Id.*

MVP co-produced the event, while Holden Boxing would be the licensed promoter and Jake Paul and Bidarian would serve as executive producers.[46]

83. By 2024, the obviousness of the absence of a separation between MVP and Holden had become even more glaring. The Texas Department of Licensing and Regulation's official event results for November 15, 2024, lists "HOLDEN BOXING LLC" as the promoter for the AT&T Stadium event that included *Jake Paul vs. Mike Tyson*, *Katie Taylor vs. Amanda Serrano*, *Mario Barrios vs. Abel Ramos*, and related undercard bouts. According to Bryce Holden's own LinkedIn profile, at this time, he was already working directly for MVP as Chief Operating Officer[47]—a direct contravention of standard industry regulations and the Ali Act.

84. MVP and Paul acted in bad faith, with the incorrect licenses, in order to schedule more fights with mismatched opponents, develop their own stable of fighters via attention-grabbing spectacles that gave them notoriety—all while diverting liability to the strawman entity Holden Boxing, in direct contravention of the Ali Act.

85. The pattern did not end after MVP absorbed Holden into MVP. Rather, upon information and belief, Defendants continued to structure events in substantially the same manner, with MVP publicly serving as an executive producer and principal organizer while "wearing the mask" of another smaller, licensed promoter (which formally/officially assumed responsibility for the promotion of the bout). For example, on or about March 7, 2025, MVP

[46] 15 Rounds, *Rising Stars Ashton Sylve and Brandun Lee Highlight Jake Paul vs. Hasim Rahman Jr. and Amanda Serrano vs. Brenda Carabajal Showtime PPV Undercard Saturday, August 6 at Madison Square Garden*, (July 28, 2022) https://www.15rounds.com/tag/brenda-carabajal/?print=print-search.

[47] **Exhibit B**, Screenshot of Bryce Holden's LinkedIn Profile (showing that Holden joined MVP in or around February 2024).

partnered with United Boxing Promotions in a relationship substantially similar to its prior arrangement with Holden Boxing. The arrangement allowed MVP to continue exercising significant influence over matchmaking and event production while placing the licensed promoter between MVP and the regulatory obligations imposed by law and industry standards.

86. The consequences of this arrangement were apparent in the matchmaking itself. On that March 7, 2025, card, MVP fighter Tammara Thibeault faced Sonya Dreiling and secured a first-round technical knockout. Thibeault entered the bout with obvious physical advantages, including approximately six inches of height and more than a foot of reach over her opponent, in addition to a substantial disparity in skill. While no catastrophic injury occurred, the bout exemplified the type of mismatched contest that MVP regularly introduced. The absence of serious injury does not diminish the risk created by such matchmaking practices, which unnecessarily expose overmatched opponents to significant danger.

87. The Defendants' unlawful scheme is beyond doubt. Defendants violated the Ali Act's core prohibitions against conflicts of interest and practices that compromise a boxer's ability to receive independent representation and protection. By disregarding the statutory separation between those who promote fights and those who owe duties to fighters, Defendants deprived Hardy of the safeguards that Congress enacted to protect professional boxers from exploitation and unnecessary risk.

## V. Heather Hardy's Story

88. Heather Hardy was born on January 25, 1982, into an Irish-Catholic family and raised in the working-class neighborhood of Gerritsen Beach in South Brooklyn. As the oldest of three latchkey kids, she frequently looked after her younger sister and brother while both of her parents worked.

89. Heather excelled at athletics at an early age: she played stickball and wiffleball with the neighborhood boys and told them she aspired to be the first female pitcher for the Yankees.

90. When she got to John Jay College as an undergraduate, however, she took an interest in law enforcement and ultimately earned a degree in forensic psychology with great grades. A double threat, the jock also had a strong, capable mind.

91. At first, Heather aspired to join the FBI or a similar federal law enforcement agency, but things changed when her daughter, Annie, was born in the mid-2000s.

92. During the early years of Annie's life, Heather worked various jobs to provide for her, at one point holding six jobs at once to put food on the table.

93. At the time, Heather and Annie were living with Heather's younger sister, Kaitlyn. Sympathetic that Heather was doing nothing but working excruciating hours and then sitting at home with her baby during her scant free time, Kaitlyn bought Heather a gift certificate at a small martial-arts studio that had just opened in the neighborhood.

94. Heather took a few classes to blow off some steam, and after a couple of weeks, the studio told her that someone in an upcoming amateur fight had dropped out and a replacement was needed. Heather stepped up, and by the time she won that first fight, she knew that fighting, in one form or another, would be her ticket out of poverty and hardship.

95. This woman had natural talent. But in the early years of her budding career, as Heather developed her abilities and painstakingly (and painfully) built a name for herself, she still had to hustle like most up-and-coming fighters.

96. Her tireless efforts began to pay off. She was the first female boxer to sign a long-term deal with DiBella, for example. She even earned an individual sponsorship from Everlast.

97. But even as she racked up these touchstones of professional success for an athlete, Heather still had to struggle. On a typical day when she had a night fight in Brooklyn, she would take Annie to school, work at Gleason's in the morning, get in her daily cardiovascular exercise by running to the venue, pick up a set of tickets on consignment, run them back to Gleason's, sell them, and take them back to the venue before the fight.

98. Throughout 2017 and 2018, Heather also moonlighted in Mixed Martial Arts ("MMA") fights. She did this because boxing did not pay her enough for her and her daughter to live on comfortably. 2018 was also the year of Heather's first fight that was televised before a national television audience.[48] That night, after her first televised bout, Heather went home to her one-bedroom apartment and slept on the couch so that her daughter could have the bed.

99. Heather lost a fight for the first time on September 13, 2019, to two-time Female Boxer of the Year Amanda Serrano. Heather would later state that she might have retired undefeated after she won the WBO title in 2018, but because she needed the money, she could not.

100. Heather did not fight for nearly two years due to the COVID pandemic, but re-entered the ring on May 14, 2021, against Jessica Camara, a Canadian fighter who held the WBA female lightweight Gold title until 2025. That fight, which was one of only two times that

---

[48] As ESPN would later report, Heather claimed that she made this milestone happen when she "drunk-dialed an HBO executive and pushed to get her featherweight boxing title on TV." *See* Rothstein, *supra*.

Heather fought outside of the State of New York, was held in Murfreesboro, Tennessee. Heather lost to Camara after eight rounds.

101. By the end of the 2010s, Heather Hardy's career had already reached a natural inflection point. After having contemplated retirement in 2019, she suffered her first professional loss to Amanda Serrano; this decisive turning point was followed, in 2021, by another defeat. Although every combat-sports athlete accepts some degree of wear and tear, Hardy entered this period carrying the accumulated effects of years of competition, prior defeats, and repeated exposure to head impacts, factors that materially increased the dangers associated with Defendants placing her in a mismatched fight with Serrano in 2023. It was against this backdrop—one defined by decline, not resurgence—that, in April 2023, Bryce Holden and MVP made a pivotal call to Hardy, setting in motion the catastrophic events that followed.

## VI. Heather Hardy's Dealings with Jake Paul and MVP

102. In 2023, Heather Hardy's financial situation was dire. She wanted to retire from boxing years earlier but needed the income to support herself and her daughter. MVP's Amanda Serrano was open to another fight, especially against someone she could dominate. In this case, even better, she had dominated this fighter before. In or around April 2023, Hardy believed she was communicating directly with Serrano about a potential rematch and understood those discussions to be part of an ordinary, legitimate negotiation process between opposing sides. Based on the information presented to her, Hardy believed she was texting Serrano. These communications reflected Serrano's position that it would be a balanced and fair matchup and her general interest in the bout. In reality, Hardy was communicating via text

message with Jordan Maldonado ("Maldonado"), Serrano's trainer and brother-in-law who worked directly with MVP.

103. When Heather brought this rematch idea to Lou DiBella, he balked. It was not an even match, and DiBella strongly advised Heather against it. This did not stop MVP. After DiBella openly refused to participate in negotiations due to safety concerns for Hardy, MVP continued to arrange the fight through Maldonado. DiBella was not alone in opposing the bout. Hardy's trainers, friends (like Bruce Silverglade), and her co-promoter (Larry Goldberg) likewise expressed serious concerns about the proposed rematch. They collectively and unanimously opposed her participation because of the clear competitive imbalance and the risks it presented. Heather was desperate, however, and of questionable sound mind at the time—something that should have been obvious to MVP's agents. Nevertheless, MVP exploited Hardy's vulnerability and isolation from the very individuals responsible for protecting her interests and safety, especially DiBella, effectively circumventing the safeguards that her own team provided.

104. Heather's indirect channel of communication via Maldonado allowed MVP to continue negotiating the bout while obscuring its direct role in procuring Hardy's participation and bypassing the independent oversight that DiBella would have provided. MVP knew that DiBella was Hardy's promoter; there was no question of this fact. DiBella had worked with Hardy before, and in fact, DiBella had done business with MVP previously. Nevertheless, MVP moved forward without DiBella's direct involvement (and with full knowledge of his disapproval).

105. In arranging this fight behind DiBella's back, Jake Paul and MVP interposed Bryce Holden as the nominal promoter, operating through his shell entity, Holden Boxing. As

before, on paper, Holden appeared to function as an independent counterparty. In substance, however, he acted as a stand-in—facilitating the transaction on behalf of Jake Paul and MVP while obscuring their direct involvement and circumventing Ms. Hardy's long-standing (and well-known) relationship with DiBella.

a. The Rematch – Serrano vs. Hardy II

106. This rematch would ultimately change the trajectory of Ms. Hardy's life. Hardy and Serrano's first bout in 2019 was not close; it was a decisive victory for Serrano. *Bad Left Hook*, a popular online blog dedicated to professional boxing news, reported that Serrano "hurt [Hardy] pretty badly in the opening round, and if women fought three-minute rounds instead of two, it's doubtful that Hardy would have made it out of the opening frame, as she was reeling badly by the end of those two minutes."[49] No one was clamoring for this rematch. The only one truly interested in this fight was Jake Paul, who could use Heather's body as a sacrifice for Serrano, a new addition to his stable of women he would profit handsomely from representing.

107. The 2023 *Serrano vs. Hardy* bout was not a fight; it was an execution. Heather took 278 punches from Serrano, including 242 within a 20-minute span.[50] After ten rounds, Heather lost the match—by decision, not by knockout. The fight was a difficult watch: Heather, crying in the ring after taking repeated blows to the head, barely made it to the end of the fight. Heather only lasted as long as she did because she is a notoriously tough and dedicated fighter. After the fight, Serrano herself stated that Heather is as "tough as they come." Unfortunately,

---

[49] Scott Christ, Hardy vs Serrano Results: Amanda Serrano Dominates Heather Hardy to Win WBO Title, Bad Left Hook (Sep. 14, 2019), https://www.badlefthook.com/2019/9/13/20865351/hardy-vs-serrano-results-amanda-dominates-heather-win-wbo-title-scores-decision-dazn-boxing-news.

[50] Michael Rothstein, Amanda Serrano Defeats Heather Hardy, 'a Hell of a Fighter', ESPN (Aug. 6, 2023), https://www.espn.com/boxing/story/_/id/38142029/amanda-serrano-defeats-heather-hardy-hell-fighter.

Heather had no idea that this fight would break the camel's back. This bout ended her professional fighting career. While Hardy knew she was injured, she did not know who wrongfully caused her injuries. She did not learn of Defendants' wrongdoing in concealing their role in organizing an unfair and injury-guaranteed bout until her counsel's 2026 investigation. That investigation revealed MVP and the other Defendants' deceptive conduct which effectively lured a vulnerable and compromised Heather into a mismatch that would more than likely (and in fact did) result in her extreme injury.

b. The Aftermath

108. Heather, still in need of money, had to keep going. Fighting was how she had earned a living for most of her adult life. In early 2024, just a few months after *Serrano vs. Hardy*, Heather accepted an offer of $50,000 for a Bare Knuckle Fighting Championship ("Bare Knuckle") bout that would take place that May. As she was doing some light sparring in training for that fight, Heather suddenly lost her vision. Still partially blind after several days, Heather saw an ophthalmologist, who told her that the issue was not her eyes—it was her brain. Shortly thereafter, Heather dropped out of the Bare Knuckle fight, and a few weeks after that, the media was reporting her retirement. Although an ophthalmologist told Heather her symptoms stemmed from her brain, his opinion did not reveal the cause of her injury or the people responsible for it.

109. It was not until her medical assessments in late 2024 that Heather learned her symptoms reflected serious neurological injury rather than ordinary post-fight effects. And even then, those assessments identified only that boxing had injured her; they did not, and could not, reveal that Defendants had wrongfully engineered the rematch that caused her harm. Heather first learned these facts through her counsel's investigation in 2026.

110. On October 2, 2024, Ms. Hardy's long-time treating ophthalmologist, Anthony G. Curreri, M.D., Diplomate of the American Board of Ophthalmology and Fellow of the American Academy of Ophthalmology, formally documented Ms. Hardy's deteriorating condition. Dr. Curreri, who has treated Ms. Hardy for two decades and is well acquainted with her career and medical history, confirmed that Ms. Hardy has sustained multiple concussions resulting in cumulative traumatic brain injury. The rematch was the tipping point. During the August 2023 rematch, Serrano landed 242 punches on Hardy in twenty minutes, meaning Serrano landed nearly 14 punches per minute. A heavy volume of those landed punches was to Hardy's head and face. Dr. Curreri concluded that Ms. Hardy now suffers from a permanent disability marked by traumatic brain injury, memory loss, double vision, anxiety disorder, spatial confusion, and perception and depth inaccuracies, among other impairments. According to Dr. Curreri, these symptoms left Ms. Hardy unable to concentrate and, in all likelihood, incapable of maintaining regular employment. Dr. Curreri's assessment connected Hardy's injury to the rematch itself; it did not, and could not, reveal that Defendants had wrongfully arranged that rematch by circumventing her representatives and engaged in duplicitous conduct that put Hardy at inordinate risk that ultimately materialized. Hardy discovered those facts only through her counsel's investigation in 2026.

111. Plaintiff now lives with the daily consequences of permanent brain injury. She suffers from chronic headaches, double vision, spatial confusion, tremors, vertigo, insomnia, and severe anxiety. Once a talented student and gifted athlete, ordinary tasks, such as reading a map, crossing a street, or distinguishing left from right, are difficult and sometimes impossible for Heather. At 43, she can work only a few hours a day, coaching at a Brooklyn boxing gym,

before her symptoms force her to stop. Where championship belts once marked her achievements, Heather now relies on prescription medication and Medicaid for basic care.

112. Today, Heather's formal diagnoses include a personal history of traumatic brain injury, changes in vision, chronic traumatic encephalopathy (CTE), post-concussion syndrome, severe recurrent major depressive disorder, psychophysiological insomnia, post-traumatic stress disorder (PTSD), and alcohol use disorder. This secret lasting neurological damage was Heather's true prize while she generated substantial revenue for Jake Paul.

113. On July 30, 2026, news broke that MVP and the Professional Fighters League had entered into a partnership that significantly expanded Jake Paul's reach in combat sports.[51] The deal gave MVP access to a roster of hundreds of MMA fighters and positioned Paul to extend his growing promotional empire beyond boxing and into a new arena. For Paul and MVP, the opportunity is obvious: more events, more fighters, more attention, and more profit. But if the practices alleged in this Complaint continue unchecked, the expansion also creates the risk of more reckless spectacles, more dangerous matchmaking, and more preventable harm to professional fighters. That concern is magnified by MVP's expansion into MMA, a sport in which fighters already sustain injuries at a higher rate than boxers.[52] By extending the promotional model alleged in this Complaint to a roster of hundreds of MMA athletes, Paul and MVP risk injecting even greater incentives for reckless matchmaking and publicity-driven spectacles into an already dangerous sport, thereby increasing the likelihood of preventable fighter injuries. Heather brings this action to stop that cycle before it spreads further. She seeks

---

[51] Gabriel Brand, *MVP Promotions And PFL Merger: What Does It Mean For The Future Of MMA?*, Yahoo Sports (Aug. 5, 2026), https://sports.yahoo.com/articles/mvp-promotions-pfl-merger-does-210355381.html.

[52] Bryan Alary, *Mixed Martial Arts Bloodier but Less Dangerous than Boxing: Study, EurekAlert!* (Nov. 5, 2015), https://www.eurekalert.org/news-releases/639963.

to hold Paul, MVP, and their affiliates accountable and to prevent MVP and Jake Paul from placing additional champions and professional fighters in unnecessary danger in Paul's relentless pursuit of attention, ratings, and revenue.

## ALLEGATIONS AGAINST THE DEFENDANTS

### COUNT ONE

***Gross Negligence (Against the Defendants)***

114. Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

115. The Defendants owed Ms. Hardy a duty to exercise reasonable care in arranging, promoting, approving, matchmaking, contracting for, and staging the August 5, 2023, bout.

116. MVP owed this duty because it directly or indirectly arranged, promoted, controlled, and benefited from the bout.

117. That duty included the obligation not to use a shell intermediary to evade Ms. Hardy's representatives, not to conceal the real parties controlling the bout, not to procure Ms. Hardy's participation through deceptive or incomplete information, and not to place Ms. Hardy into an unreasonably dangerous mismatch.

118. Although Ms. Hardy became fully aware of the extent of her injuries on September 24, 2024, she could not, through the exercise of reasonable diligence, have discovered that the Defendants wrongfully caused those injuries because they concealed the nature of their involvement and the facts giving rise to their liability. In the alternative, Defendants' fraudulent concealment of their role and of the facts giving rise to their liability tolled the limitations period until March 20, 2026.

119. Jake Paul owed this duty individually because he personally participated in, directed, approved, ratified, or benefited from the arrangement that placed Hardy into the bout.

His liability arises from his own conduct, not merely from his ownership or association with MVP.

120. Holden Boxing LLC owed this duty because it acted as the nominal contracting party, intermediary, or conduit which arranged the bout.

121. The Defendants breached their duties by: arranging or approving a dangerous mismatch; bypassing DiBella; using Holden Boxing LLC as a shell or nominal counterparty; failing to conduct or honor reasonable safety review; and proceeding despite the foreseeable risk of serious injury to Ms. Hardy.

122. Under Tex. Civ. Prac. & Rem. Code Ann. § 41.001, viewed objectively from the Defendants' standpoint at the time, Defendants' acts and omissions involved an extreme degree of risk, considering both the probability and magnitude of potential harm to Plaintiff.

123. The matchup between Plaintiff and her opponent presented a foreseeable and highly probable risk of severe neurological injury, including concussion, traumatic brain injury, and chronic traumatic encephalopathy, due to disparities in competitive caliber, coupled with well-known risks in professional boxing of cumulative and second-impact brain injury.

124. Under Tex. Civ. Prac. & Rem. Code Ann. § 41.001, Defendants had actual, subjective awareness of the extreme degree of risk but nevertheless proceeded with conscious indifference to Plaintiff's health and safety.

125. Defendants' circumvention of DiBella and these safeguards evidences Defendants' awareness that the matchup posed unreasonable and indefensible risks and their decision to proceed regardless.

126. The Defendants had actual, subjective awareness of that risk but proceeded with conscious indifference to Ms. Hardy's rights, safety, and welfare. Gross negligence in Texas requires this combination of extreme risk, actual awareness, and conscious indifference.

127. Defendants' gross negligence was a proximate cause of Plaintiff's injuries and damages, including traumatic brain injury and CTE-consistent neurological impairment.

128. Defendants' conduct was willful, wanton, and carried out with conscious indifference, warranting exemplary damages.

COUNT TWO

***Negligent Undertaking (Against the Defendants)***

129. Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

130. The Defendants undertook to arrange, approve, matchmake, promote, facilitate, contract for, or stage the August 5, 2023, bout.

131. These services were necessary for Ms. Hardy's protection because the matchmaking, approval, disclosure, contracting, and event-approval process directly affected whether Ms. Hardy would be placed into a reasonably safe or unreasonably dangerous bout.

132. The Defendants failed to exercise reasonable care in performing that undertaking.

133. The Defendants increased the risk of harm to Ms. Hardy by bypassing DiBella , concealing the true structure of the transaction, and placing her into a professional bout that was, in reality, a dangerous mismatch.

134. Although Ms. Hardy became fully aware of the extent of her injuries on September 24, 2024, she could not, through the exercise of reasonable diligence, have discovered that the Defendants wrongfully caused those injuries because they concealed the nature of their involvement and the facts giving rise to their liability. In the alternative, Defendants' fraudulent

concealment of their role and of the facts giving rise to their liability tolled the limitations period until March 20, 2026.

135. Ms. Hardy reasonably relied, directly or indirectly, on the Defendants' undertaking because the Defendants presented the bout as a legitimate, properly arranged professional fight rather than as a conflicted, concealed, and unsafe transaction.

136. Jake Paul is individually liable because he personally participated in or approved the undertaking and its negligent performance.

137. The Defendants' negligent undertaking proximately caused Ms. Hardy's injuries and damages.

## COUNT THREE

### *Negligence Per Se (Against the Defendants)*

138. Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

139. The Defendants were required to comply with applicable Texas combative-sports laws, boxing regulations, licensing requirements, disclosure obligations, promoter requirements, and safety rules.

140. The Defendants violated provisions of the Texas Combative Sports Act, Tex. Occ. Code Chapter 2052, and corresponding regulations set forth in 16 Tex. Admin. Code Chapter 61, including but not limited to requirements governing: promoter licensing and qualifications; pre-bout medical examinations and neurological clearance; matchmaking standards and bout approval; ringside physician presence and stoppage protocols; and mandatory disclosures to regulatory authorities and fighters.

141. Tex. Occ. Code § 2502.001 et. seq., together with 16 Tex. Admin Code §§ 61.20, 61.23, 61.40, 61.80, and 61.91, requires that persons acting as boxing promoters be properly

licensed, qualified, and disclosed to the Texas Department of Licensing and Regulation and/or the Texas Combative Sports Program.

142. The Defendants violated those provisions by, among other acts and omissions:

a. exercising actual control over the promotion through Bryce Holden and Holden Boxing LLC;

b. using Holden Boxing LLC, as a nominal promoter while concealing the identity of the persons exercising actual control;

c. failing to disclose this reality to Ms. Hardy and regulators; and/or

d. otherwise circumventing promoter licensing and disclosure requirements.

143. Tex. Occ. Code § 2502.001 et. seq. and 16 Tex. Admin. Code §§ 61.46, 61.47(a), and 61.91, require compliance with contestant health and safety requirements, including pre-bout medical examinations, neurological clearance, disclosure of material medical information, and other measures designed to protect fighters from preventable injury.

144. The Defendants violated those provisions by:

a. withholding or concealing information material to fighter safety, including that the matchup they designed featured a substantial disparity in skill and competitive readiness between the fighters which heightened safety risks; ignoring internal assessments, analyses, and discussions that the matchup posed an unreasonable risk of injury; disregarding or withholding concerns raised by trainers, medical personnel, or other participants; and designing the bout to produce a highly predictable outcome rather than a *bona fide* competitive contest; and/or

b. otherwise proceeding with the bout despite circumstances demonstrating an unreasonable risk of serious injury to Plaintiff.

145. Additionally, Tex. Occ. Code § 2502.102 and 16 Tex. Admin. Code §§ 61.23(e), expressly provides that a promoter shall not permit another person or entity to use its license.

146. Holden Boxing LLC permitted MVP to use its promoter's license in connection with the August 5, 2023, bout. By permitting MVP to use its promoter's license, Holden Boxing LLC violated Tex. Occ. Code § 2052.102 and Tex. Admin. Code §§ 61.23(e).

147. These statutes and regulations were designed to protect professional fighters, including Ms. Hardy, from the type of injury suffered—namely severe bodily and neurological harm.

148. The Defendants' statutory and regulatory violations constitute negligence *per se*.

149. The Defendants were also required to comply with federal boxing laws governing professional boxing, conflicts of interest, promoter-manager separation, and fair dealing with boxers.

150. Ms. Hardy was within the class of persons these laws and rules were designed to protect.

151. As a direct and proximate result of Defendants' violations, Ms. Hardy suffered the precise harms that the applicable fighter-safety statutes, regulations, and rules were intended to prevent: repeated head trauma and neurological injury, including a heightened risk of CTE, together with ongoing headaches, dizziness, vision impairment, balance difficulties, memory loss, cognitive impairment, and related long-term neurological consequences.

152. The Defendants violated applicable statutory and regulatory standards by using a shell or nominal party to arrange the bout, concealing conflicts and true control, bypassing DiBella, and arranging or approving a dangerous mismatch.

153. Although Ms. Hardy became fully aware of the extent of her injuries on September 24, 2024, she could not, through the exercise of reasonable diligence, have discovered that the Defendants wrongfully caused those injuries because they concealed the nature of their involvement and the facts giving rise to their liability. In the alternative, Defendants' fraudulent concealment of their role and of the facts giving rise to their liability tolled the limitations period until March 20, 2026.

154. Jake Paul is individually liable to the extent he personally participated in, directed, approved, ratified, or benefited from the statutory and regulatory violations.

155. The Defendants' statutory and regulatory violations proximately caused Ms. Hardy's injuries and damages.

COUNT FOUR

***Negligence (Against the Defendants)***

156. Plaintiff incorporates by reference all of the preceding paragraphs as if fully set forth herein.

157. The Defendants owed Ms. Hardy a duty of reasonable care arising from their control over matchmaking and event conditions, the special relationship between promoter and fighter, the foreseeable risk of catastrophic head trauma, and applicable industry standards and regulatory requirements.

158. The Defendants breached those duties by, among other things, selecting a grossly mismatched opponent, failing to adequately assess Ms. Hardy's fitness and risk factors, failing to ensure appropriate medical screening and supervision, and proceeding with the bout despite foreseeable danger.

159. The Defendants dereliction in duty is the but-for and proximate cause of Ms. Hardy's brain and concussive injuries, as well as the other physical and mental health conditions that Ms. Hardy suffers. Had the Defendants not pushed Ms. Hardy to fight, Ms. Hardy would not have engaged in the fight that resulted in her sustaining long-term brain injuries, as well as severe psychological conditions.

160. The Defendants' breaches proximately caused Ms. Hardy's injuries and damages.

161. Ms. Hardy pleads this claim in the alternative to gross negligence to preserve recovery of compensatory damages.

## COUNT FIVE

***Violation of the Muhammad Ali Boxing Reform Act (Against the Defendants)***

162. Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

163. Plaintiff Heather Hardy was, at all relevant times, a professional boxer.

164. The August 5, 2023, bout in Dallas County, Texas was a professional boxing match within the meaning of the Muhammad Ali Boxing Reform Act because it was a boxing contest held in the United States between professional boxers for financial compensation.

165. Congress enacted the Muhammad Ali Boxing Reform Act to protect professional boxers from exploitative, oppressive, and unethical business practices and to preserve integrity in professional boxing.

166. For the August 5, 2023, bout in Dallas County, Texas, the Defendants acted as promoters, matchmakers, managers, agents, representatives, or boxing-service providers within the meaning of the Act.

167. The Defendants violated the Act by blurring or collapsing the required separation between promoter-side interests and boxer-side representation by acting as both agent and promoter.

168. Specifically, Jake Paul and MVP used Holden to act as a nominal intermediary or representative while MVP and Jake Paul retained direct or indirect promotional, financial, managerial, or control interests in the bout.

169. The Ali Act prohibits certain conflicts between promoters and managers, including direct or indirect financial interests crossing the promoter-manager line.

170. The Ali Act expressly provides a private right of action to any person injured by a violation of its provisions.[53]

171. Defendants Jake Paul and MVP used Holden to arrange, paper, facilitate, procure, or obscure the true promoter-side interested and agent-side control behind Plaintiff's bout.

172. The Defendants' conduct deprived Ms. Hardy of independent representation, truthful disclosures, conflict-free negotiation, and meaningful protection in connection with the bout.

173. The Defendants' conduct was not merely promotional. The Defendants inserted themselves into the procurement, negotiation, arrangement, and control of Ms. Hardy's precipitation in the bout while simultaneously benefitting from the event as promoters.

174. The Defendants concealed MVP's and Jake Paul's true role in the transaction and failed to disclose material facts about control, conflicts, matchmaking, and financial interests.

---

[53] 15 U.S.C. § 6309(d). (Any boxer who suffers economic injury as a result of a violation of any provision of this chapter may bring an action in Federal or State court and recover the damages suffered, court costs, and reasonable attorneys' fees and expenses).

175. Although Ms. Hardy became aware of her injuries on September 24, 2024, she could not, through the exercise of reasonable diligence, have discovered that the Defendants wrongfully caused those injuries because they concealed the nature of their involvement and the facts giving rise to their liability; Plaintiff first learned of the Defendants role in causing her injuries from her attorneys' investigation of those facts on March 20, 2026. In the alternative, Defendants' fraudulent concealment of their role and of the facts giving rise to their liability tolled the limitations period until March 20, 2026.

176. Jake Paul is individually liable because he personally participated in, directed, approved, ratified, or benefited from the conflicted structure.

177. The Defendants' violations caused Ms. Hardy injury and damages.

178. Plaintiff's economic injuries include, but are not limited to, unpaid or underpaid purse value, compensation she would have demanded with full disclosure, lost future bout opportunities, medical and treatment-related economic losses, lost earning capacity, career interruption, and diminished professional marketability.

179. As a direct and proximate result of Defendants' violations of the Ali Act, Hardy suffered economic damages, including but not limited to lost earning capacity, lost future fight opportunities, lost business and endorsement opportunities, medical expenses, and other financial losses flowing from the injuries and career consequences that Defendants' unlawful conduct caused.

180. Pursuant to 15 U.S.C. § 6309(d), Ms. Hardy is entitled to recover damages suffered as a result of the Defendants' violations of the Ali Act, together with court costs, reasonable attorneys' fees, and reasonable expenses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the relief delineated in the preceding paragraphs, and which can be summarized in general terms as follows:

A. An award of damages against ALL DEFENDANTS in an amount to be determined at trial but greater than $10,000,000, including, but not limited to, compensatory damages, punitive damages, liquidated damages, exemplary damages, economic damages, and any other applicable damages within jurisdictional limits;

B. An injunction and order against ALL DEFENDANTS to take the necessary action to prevent the harm that Plaintiff has suffered from happening to any other fighters, current and future;

C. Prejudgment interest on all amounts due;

D. An award of costs that Plaintiff has incurred in this action, including, but not limited to, Plaintiff's reasonable attorneys' fees and costs; and

/

/

/

/

[REST OF PAGE INTENTIONALLY LEFT BLANK]

/

/

/

E. Such other and further relief as the Court may deem just and proper.

Dated: September 23, 2026
New York, New York

Johnson Vaughn & Heiskell

*/s/ Michael P. Heiskell, Esq.*
Michael P. Heiskell, Esq.
500 W 7th Street
Fort Worth, TX 76112
mheiskell@johnson-vaughn-heiskell.com

ChaudhryLaw PLLC

*/s/ Priya Chaudhry*
Priya Chaudhry
(*Pro hac vice* forthcoming)
Justin Mungai
(*Pro hac vice* forthcoming)

147 West 25th Street, 12th Floor
New York, New York 10001
Tel: (212) 785-5550
priya@chaudhrylaw.com
justin@chaudhrylaw.com

*Attorneys for Plaintiff*
*Heather Hardy*